## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

LAUREN A. ESTON,                    )
                                    )
      Plaintiff,              )
                                    )
    v.                          )     No. 18-cv-3300
                                    )
ANDREW SAUL,                        )
Commissioner of Social Security,    )
                                    )
      Defendant.              )

## <u>REPORT AND RECOMMENDATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Lauren A. Eston appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Eston filed a Brief in Support of Motion for Summary Judgment (d/e 10).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 12).  This matter is before this Court for a Report and Recommendation.  For the reasons set forth below, this Court recommends that the Decision of the Commissioner should be affirmed.

## STATEMENT OF FACTS

Eston was born on May 21, 1963.  She finished the twelfth grade and secured a GED.  She previously worked as a stocker and a cashier at Walmart.  She alleged that she became disabled on March 31, 2011 (Onset Date).  Eston was insured for Disability Benefits through December 31, 2016 (Date Last Insured).  From her Onset Date to her Date Last Insured, Eston suffered from degenerative disc disease, spondylolisthesis, lumbago, status post multiple back surgeries, including lumbar fusion and cage insertion, radiculopathy, osteoarthritis of the left foot, osteoarthritis of the right shoulder status post right rotator cuff repair, mild degenerative joint changes at the acromioclavicular (AC) joint, obesity, cannabis dependence, migraine headaches, tinnitus, and depression.  R. 13, 15-16, 47, 206, 222.

On October 22, 2010, Eston saw her primary care physician Dr. Jason Sharp, M.D., for back pain.  R. 350-51.  Eston said she went to the emergency room and they told her she had a muscle strain.  Eston said her pain was very bad and she could not sit or lie down due to the pain.  The emergency room physician prescribed hydrocodone, Flexeril, and naproxen.  Eston said that none of the medications helped.  On examination, Eston had decreased lordosis in her lumbar spine, tenderness at L3 to L5, and paraspinal muscle spasms and tenderness.  Eston had

limited and painful range of motion in her lumbar spine.  She had positive straight leg raising tests.  R. 350-51. X-rays of her lumbar spine. showed moderately severe degenerative disk disease at L4-5 and L5-S1.  R. 363. Dr. Sharp assessed lumbago and mentioned a concern for a lumbar disc rupture.  Dr. Sharp prescribed medication and ordered an MRI of her lumbar spine.  R. 351.

On October 29, 2010, Eston had an MRI of her lumbar spine taken. The MRI showed multilevel degenerative disk disease with a bulging disk at L4-5, a small midline focal disk protrusion at the lumbosacral interspace level, and abnormally soft tissue at the L3 level.  R. 364.

On November 1, 2010, Eston was admitted to Blessing Hospital in Quincy, Illinois (Blessing).  Eston complained of low back pain.  She reported that her low back pain began almost three weeks earlier when she tripped.  The pain radiated to Eston's left thigh and left lower extremity. Eston reported that a week after the trip, she tripped again and exacerbated her pain.  On November 2, 2010, neurosurgeon Dr. Emilio Tayag, M.D., performed surgery on Eston's lower back to remove disc fragments at L2 and L3 and performed a hemi-laminotomy.  Eston was discharged from Blessing on November 3, 2010.  R. 308.

On November 17, 2010, Eston saw Dr. Tayag for a two week post-operative visit.  Eston reported that her lumbar radiculopathy had improved, but she still had pain when she twisted or lifted.  On examination, Eston had a normal gait, and her motor function was 5/5.  R. 317.

On December 15, 2010, Eston saw Dr. Tayag for a six week post-operative visit.  R. 315-16.  Dr. Tayag noted, "Mrs. Eston returns for follow up.  She is doing very well.  Her back pain is gone.  She does have some numbness, No new complaints."  R. 315.  Dr. Tayag stated that Eston could "go back to work with lifting restriction."  R. 316.

On November 16, 2011, Eston saw Dr. Tayag.  Eston reported that she fell 10 days earlier.  She reported that since then, she had severe pain above and below the surgical region of her back.  Dr. Tayag ordered an MRI of Eston's lumbar spine and prescribed pain medication.  R. 312, 860.  On December 7, 2011, Eston had an MRI of her lumbar spine taken.  The MRI showed interval post-surgical changes, degenerative changes predominantly at the L4-5 and L5-S1 levels, and possible cholelithiasis.  R. 365.

On March 17, 2013, Eston went to the Blessing emergency room complaining of back pain.  Eston reported that she thought she hurt her back while engaging in "spring cleaning."  R. 321.  She said that the pain

radiated down into her right leg. She said that the pain worsened with movement. On examination, the emergency room personnel observed decreased range of motion and muscle spasms in her back. Her motor, sensation, and reflex examinations were normal. She was diagnosed with acute low back pain and sciatica. Her condition improved and she was released home. R. 322.

On March 20, 2013, Eston had an MRI of her lumbar spine. The MRI showed significant disc space narrowing at L4-5 and L5-S1, moderate narrowing at L3-4, moderate stenosis at L3-4, L4-5, and moderate to severe stenosis at L5-S1. R. 358.

On September 3, 2013, Eston saw Dr. Sharp for a follow up on her lumbar spondylosis. R. 328. Eston had received a lumbar epidural steroidal injection on August 30, 2013. R. 360. Eston reported that she was feeling much better. She said she was able to rake the yard and to do things she had not been able to do for years. Eston denied any back stiffness, buttock pain, or lower extremity pain. Eston also denied any lower extremity weakness. R. 328. On examination, Eston had tenderness in her T12-L2 and S1-S2 areas of her spine. She had full range of motion and normal motor function. Straight leg testing was negative. Her

sensation was diminished of the left knee and medial leg.  R. 328.  Dr.

Sharp referred Eston to an orthopedic surgeon for a consultation.  R. 329.

On April 25, 2014, Eston saw nurse practitioner Tonya Hauff, NP, for

left shoulder pain.  R. 369-70.  Eston said she hurt her shoulder when she

picked up a bag of groceries.  She went to the emergency room on April

23, 2014 and was given naproxen and Valium.  R. 393-94.  Eston told

Hauff that these medications did not work.  Eston reported that the pain

was most severe below the scapula in the shoulder and left neck.  She

rated her pain as 500/10.  On examination, Eston had tenderness in

several parts of the shoulder and paraspinal muscle spasms on the left.

Hauff administered an NSAID Ketorolac, Tromethamine and prednisone

steroid injections into Eston's shoulder.  She also ordered an x-ray of the

left shoulder.  R. 370.  The x-rays showed mild joint space narrowing and

spur formation in AC joint, but no fracture or dislocation.  R. 390.

On May 7, 2014, Eston saw Dr. Sharp for left knee pain.  Eston said

that two months earlier she twisted her left knee when she jumped up to kill

a bug.  She reported knee swelling and warmth, but no redness, locking, or

clicking.  She reported that the symptoms were worsening.  She reported

sharp and burning knee pain. On examination, Eston's left knee was

swollen.  Her patella and medial joint line were tender on palpation.  The

knee's range of motion was limited.  Dr. Sharp prescribed crutches and naproxen for pain.  Dr. Sharp renewed Eston's hydrocodone prescription for back and shoulder pain.  R. 366-67.  X-rays of Eston's left knee taken at this time showed no acute osseous abnormality.  R. 392.

On May 17, 2014, Eston saw state agency physician Dr. Raymond Leung, M.D., for a consultative examination.  R. 396-402.  Eston reported that she had surgery in November 2010 because she had crushed vertebrae from an incident in October 2010.  Eston said that she did not go to physical therapy.  She reported that she did not use a cane or walker.  She said that her back pain radiated into her left leg.  She said that her pain medication did not help.  Eston said she could walk less than one block and could lift two gallons of milk.  She said that she last worked in March 2011 at Walmart.  Dr. Leung also reviewed the CT scan of Eston's spine dated March 20, 2013.  R. 396.[1]

On examination, Eston walked with a mild limp, and her gait was stiff with short strides.  Eston could walk 50 feet.  She could heel walk and tandem walk but could not toe walk or hop.  Eston stated that she could not squat and did not try.  Eston had decreased range of motion in her knees,

---

[1] Eston's counsel cites Dr. Leung's consultative examination report to support her statement that she received "left knee steroid injections for meniscus problems. (TR 396-398)".  Eston Brief, at CM-ECF page number 14 of 19.  Dr. Leung's report does not mention such injections.  The Court uses the CM-ECF pagination because Eston's counsel did not paginate the Eston Brief.

shoulders, and lumbar spine.  Dr. Leung found no muscle atrophy or spasms.  Eston's pinch, arm, and grip strength were 4+/5.  Her left leg strength was 4/5, and right leg strength was 4+/5.  Eston had no difficulty getting on and off the examination table.  Her sensations were within normal limits.  Dr. Leung assessed history of stenosis at L3-4, L4-5, and L5-S1; disk bulge at L3-4 and L4-5, limited range of motion in the lumbar spine; and stiff gait with short strides and a moderate limp.  R. 398. Dr. Leung noted that Eston developed moderate pain during the examination. R. 397.

On May 20, 2014, Eston saw Dr. Sharp for a follow up on her left knee pain.  Eston said that her knee pain was not much better, and her neck pain was better.  Eston was all out of pain medication.  She said she went to a chiropractor the previous Saturday.  On examination of her left knee, the patella and medial joint were tender, and range of motion was limited.  Dr. Sharp refilled her hydrocodone prescription.  R. 403.

On May 22, 2014, Eston had an MRI of her left knee.  The MRI showed a root tear of the medial meniscus, no evidence of a ligament tear, moderate chondromalacia, and moderate joint effusion.  R. 410.

On May 30, 2014, state agency physician Dr. Young-Ja Kim, M.D., prepared a Physical Residual Functional Capacity Assessment of Eston.

R. 87-89.  Dr. Kim opined that Eston could occasionally lift 20 pounds and frequently lift 10 pounds; stand and/or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently crawl; occasionally balance, stoop, kneel, crouch, and climb ramps and stairs; and never climb ladders, ropes, and scaffolds.  R. 87-88.

On November 5, 2014, Eston saw advance practice nurse Nicollette Haubrich, ANP,FNP-BC, in the Southern Illinois University School of Medicine Division of Orthopedics, for left knee pain.  R. 543-45.  Eston reported that her knee pain had decreased.  She rated her pain at 2/10. Eston reported that the steroid injection Haubrich administered previously relieved 75% of her symptoms.  Eston said she was not contacted by physical therapy and did not attend any sessions.  Haubrich rescheduled Eston for two to three physical therapy sessions.  Haubrich noted that Eston may call to make an appointment for low back pain, "which will be a new problem."  R. 545.

From November 10, 2014 to November 19, 2014, Eston went to physical therapy three times for left knee pain.  R. 625-33.  Eston reported that her knee was sore.  She said that she twisted it while walking her dog. On examination, her gait was slightly antalgic, her knee was hypermobile in some motions.  On November 19, 2014, at the last therapy session, Eston

had an abnormal, slightly antalgic gait, with some limited range of motion in her knee. Eston's left knee range of motion was 4/5 and her right knee range of motion was 5/5. R. 632. Eston tolerated the therapy session on her knee without complaints of pain or difficulty. The therapist gave Eston a home exercise program and discharged her from physical therapy. R. 633.

On November 22, 2014, Eston had x-rays of her lumbar spine taken. The x-rays showed multilevel degenerative disc disease particularly involving L4-L5 and L5-S1, with no instability with flexion or extension. R. 411.

On November 24, 2014, Eston saw advanced practice nurse Haubrich for low back pain. R. 537-40. Eston reported a recent increase in her back pain. Eston reported that she was in severe pain at the office visit. She said that the pain woke her up at night. Eston denied any radiating pain into her lower extremities. Eston said that walking, standing, and prolonged sitting aggravated her pain. Heat packs relieved some of her pain. She said the epidural injection on August 30, 2014, provided relief for a couple days. Haubrich reviewed the November 22, 2014 x-rays. On examination, Eston had normal gait and posture, normal range of motion in her extremities with normal muscle tone and strength. Eston had sharp

discomfort on palpitation of her lumbar spine.  She had decreased range of motion in her spine.  Straight leg tests were positive.  She had decreased sensation in her thigh and legs and 5-/5 strength in her quadriceps muscles.  R. 539.  Haubrich assessed multilevel degenerative disc disease.  She ordered an MRI and told Eston to follow up with orthopedic surgeon Dr. Nitin Kukkar, M.D.   Haubrich recommended six weeks of physical therapy and renewed Eston's prescription for meloxicam.  R. 540.

Eston saw the physical therapist on November 25, 2014 for evaluation.  Eston attended four physical therapy sessions from November 25, 2014 to December 8, 2014.  R. 639-47.  Eston cancelled twice on December 1 and 12, 2014.  R. 641, 648.

On December 11, 2014, Eston saw Dr. Kukkar.  R. 417-19.  Eston reported that she was doing alright since her surgery in 2010.  She said that her back pain was back.  She said that the radiculopathy in her left leg was as bad as before.  R. 417.  Eston rated her pain as 10/10.  R. 418.  On examination, Eston was fidgety.  She could not get comfortable sitting. Range of motion in her legs was painful.  Eston said that she could not continue with physical therapy because the therapy hurt her "too bad."  Dr. Kukkar stated that his only surgical recommendation would be a spinal fusion from L2 to her pelvis.  Dr. Kukkar explained the risks of such a

procedure and told Eston to think about it and see him in a few weeks to discuss options.  R. 418.

On January 19, 2015, Eston was admitted to Blessing.  Dr. Kukkar performed an elective L2 to pelvis transforaminal lumbar interbody fusion. R. 424-39.  Eston preoperative diagnosis was degenerative disc disease from L2-S1 with back pain, radiculopathy, and instability with spondylolisthesis.  R. 438.  Dr. Kukkar explained to Eston that she would be evaluated for physical therapy and occupational therapy the day after the surgery.  Dr. Kukkar also stated that after surgery, Eston needed a thoracolumbar brace for her back.  R. 425.

On January 27, 2015, Dr. Kukkar performed a stage II posterior instrumentation with pelvic fixation surgery on Eston.  The surgery involved implanting screws and rods in her back from L2 to the pelvis.  R. 443, 452. Dr. Kukkar instructed Eston to limit excessive bending and not to lift more than 10 pounds until the follow up appointment.  Dr. Kukkar told Eston to walk for exercise and to increase gradually the distance to increase endurance.  R. 452.

On February 10, 2015, Eston saw Dr. Kukkar for a medication refill. Dr. Kukkar switched Eston's pain medication from hydrocodone-acetaminophen to oxycodone-acetaminophen.  R. 527.

On February 18, 2015, Eston saw Dr. Sharp. Eston reported that her back pain had worsened. Eston said she had very severe pain in her left hip. Eston said Dr. Kukkar said that pain was the healing. Eston also reported numbness and tingling in her left toes. R. 455. Dr. Sharp did not examine Eston's back at this time. R. 456.

On March 12, 2015, Eston saw advanced practice nurse Haubrich for a post-operative visit. R. 472-73. Eston reported right side lumbar pain and left foot pain and numbness. Eston said the foot pain was worse. She rated that pain at a 7/10. Eston stated that she was not wearing her back brace all the time. Eston said she took the back brace off when she was at home. Eston did not wear the back brace at this office visit. Haubrich told Eston to use her back brace at all times. Haubrich put Eston on a restriction of no forward flexion and no lifting over 10 pounds. R. 473. On March 16, 2015, Eston had x-rays of her left foot. The x-rays showed osteoarthritis of the left foot without acute fracture. R. 840.

On April 8, 2015, Eston went to physical therapy. R. 653-55. She reported pain in her left foot after her January 2015 surgeries. She said she could not move the first three toes on her left foot. She reported numbness, tingling, and decreased sensation in her left foot. She said that she only slept four hours a night due to the pain. R. 653. On examination,

Eston had a moderately abnormal gait and reduced strength in her hips, knees, and ankles.  She had reduced range of motion in her spine.  She also had reduced sensation in her left foot.  R. 653.  The physical therapist recommended four weeks of physical therapy and a home exercise program.  R. 654.

Eston attended eight physical therapy sessions from April 8, 2015, to April 29, 2015.  On April 29, 2015, Eston reported that she was having severe low back pain and sharp pain around her incision.  R. 670.  Eston tolerated the session with mild complaint of pain and difficulty.  R. 672.

On April 30, 2015, Eston saw Dr. Kukkar for post-operative visit.  R. 464-66.  Eston reported back pain and numbness in her left toe.  On examination,  Eston had point tenderness around the incision, some buttock pain, but no leg pain.  She had 5/5 strength in her lower extremity muscles.  X-rays showed the hardware to be in "excellent position."  R. 464.  Dr. Kukkar said massages at physical therapy were aggravating her condition.  Dr. Kukkar recommended aqua therapy instead of her current physical therapy.  Dr. Kukkar said deep tissue massages were strictly prohibited.  R. 465.

On May 7, 2015, Eston saw a physical therapist for initial evaluation for aquatic physical therapy for her back condition.  The therapist

recommended aquatic physical therapy exercise sessions twice a week for eight weeks.  R. 856.

On July 1, 2015, Eston was discharged from physical therapy.  Eston has attended seven aquatic exercise sessions since May 7, 2015.  The therapist stated that Eston attended only seven sessions "due to insurance coverage."  R. 854.  Eston did not use assistive devices to walk.  Eston reported that she did not use assistive devices to walk out in the community.  Eston reported that she could only walk 250 feet before she felt intense low back pain.  The therapist stated that Eston had not improved much during the course of aquatic therapy but had slightly increased her tolerance to aquatic physical therapy exercises.  R. 853.

On August 10, 2015, Eston saw state agency physician Dr. Joseph Kozma, M.D., for a consultative examination.  R. 479-83.  Eston reported low back pain with radiation into the left leg and toes.  Eston stated that she could not walk a block.  She said that she had a cane but was embarrassed to use it. R. 479.  Eston said that she used a walker at home.  R. 482.  Eston reported that she could not stand for more than 10 minutes.  She reported cramps in her left leg and difficulty picking up objects on the floor.  Dr. Kozma noted, "[S]he is very emphatic about her disability.  She claims that she is doing okay except for her back and that is the main reason for

Page **15** of **47**

her application for benefits." Eston said she had difficulty sitting because of pain in her left leg. She said she could not carry a gallon of milk. She said she had difficulty holding a cup of coffee, but also said that she did not have difficulty with her hands. R. 479.

On examination, Dr. Kozma found no tenderness in her cervical spine with normal tone in the paravertebral muscles of the neck. Her muscles in her extremities had normal strength with no wasting or stiffness. She had normal range of motion in her upper extremities and normal dexterity in her fingers. Her grip strength was 5/5 bilaterally. R. 481. Eston's scars from her back surgeries were mildly tender. Eston did not attempt heel walking, toe walking, or squatting because she claimed those actions caused extreme pain. Eston could not bend over forward very far. The range of motion in her lumbar spine and pelvis was limited. Eston walked with a short stride, she initiated walking without hesitation, and she turned normally. Her posture was normal with no postural instability. R. 482. Dr. Kozma assessed "Chronic low back pain (probably due to surgical failure)" and "Possible chronic pain syndrome." R. 483.

On September 1, 2015, state agency physician Dr. Sumanta Mitra, M.D., prepared a Physical Residual Functional Capacity Assessment. R. 101-04. Dr. Mitra opined that Eston could frequently and occasionally lift

10 pounds; stand and/or walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb stairs or ramps, balance, stoop, kneel, crouch, and crawl; and never climb ropes, ladders, or scaffolds.  R. 101-03.

On November 12, 2015, Eston saw nurse practitioner Daveda Voss, CNP, in the Blessing Pain Clinic for a pain management consultation.  R. 724-27.  Eston said she continued to have worsening back pain since her back surgery in January 2015.  Eston rated her pain as ranging from 5/10 to 10/10.  She said her left leg and great toe went to sleep and were painful.  She said the pain worsened with standing, walking, bending, and lifting; and improved with pain medications, heat, cold, repositioning, lying flat, water exercise, and relaxation.  Eston was on morphine but showed no improvement in her pain.  Eston also did not follow good sleep hygiene. Eston said she was not doing any cardiovascular level exercise.  She said that water exercises at physical therapy helped.  Eston admitted she used marijuana intermittently.  R. 724.  Eston sat fairly postured throughout the office visit.  Eston's gait was significantly postured leaning forward with rounded shoulders and a wide-based stance.  Eston's range of motion was intact.  Eston's musculature of her extremities were mildly deconditioned. Straight leg testing was positive in the supine position.  R. 725.  Voss

educated Eston on proper sleep hygiene. Voss "strongly admonished" Eston to complete an application for a scholarship or discounted membership at the YMCA or Kroc Center so Eston could use a swimming pool to engage in water exercises. Voss instructed Eston to start walking for five minutes, twice a day and not to sit for longer than one hour without getting up and moving around. Voss told Eston how to improve her posture. Voss said Eston's poor posture was contributing to her pain. R. 726.

On November 16, 2015, Eston went to physical therapy for an initial evaluation. R. 849-51. Eston reported severe low back pain. Eston said her pain was 8/10 at the evaluation, and 10/10 at the worst. Eston said she had difficulty performing upright activities and lifting or carrying more than five pounds. She said she could not do laundry because she could not go up and down stairs. On examination, tenderness on palpation of her incisions in her lumbar spine. She had decreased push off on her left side when walking or in getting into a full stance on her left side. Eston had decreased sensation in her left foot and first three left toes. R. 849. Eston also had decreased range of motion in her lumbar spine and decreased strength in her lower extremities. The physical therapist recommended two

sessions a week for 10 weeks.  Most of the therapy would be aquatic therapy.  R. 851.

On December 3, 2015, Eston saw nurse practitioner Voss.  R. 730-34.  Eston reported that she had a 70-80% improvement in her sleep hygiene and a 30% improvement in her chronic pain.  R. 735.  Eston said she had been staying active since her last visit.  She said that she was getting quite bit of exercise by walking outside.  R. 733.  Eston said she was participating in physical therapy but was waiting for Medicaid approval before starting the aquatic therapy.  Eston said she did not follow through on applying for a scholarship to the YMCA.

On examination, Eston was walking upright without leaning at the hips or rounding her shoulders as she did previously.  Her arm and leg muscles were mildly deconditioned.  Her strength was strong and equal bilaterally.  Voss recommended that Eston take walks twice a day.  Voss recommended following through with physical therapy and a home exercise program.  Voss also recommended applying for scholarships to pay for a membership at the YMCA or Kroc Center so she could perform water exercises in the pool.  Voss told Eston not to sit for more than one and a half hours without getting up and doing some physical activity for at least five minutes.  R. 731.

On January 7, 2016, Eston saw nurse practitioner Voss for a follow up on the pain management consultation.  R. 735-37.  Eston reported a 40-50% improvement in her sleep and a 25-30% improvement in her overall pain condition.  She said her pain increased because she had to scrub the floors after her husband spilled a plate of food.  She said she had not followed through on trying to get memberships at the YMCA or Kroc Center and was not doing the water exercises.  She said she was walking 10 to 15 minutes a day on a treadmill in her home.  Eston said that she did not attend physical therapy and received a phone call the day before that Medicaid had approved her physical therapy.  R. 735.  On examination, Eston sat comfortably throughout the office visit without needing to change positions.  R. 736.  The appointment took 45 to 50 minutes.  R. 737.  Eston walked upright without leaning forward or rounding her shoulders.  Her strength was strong bilaterally, but her muscles were mildly deconditioned.  Eston needed encouragement to perform lower extremity maneuvers.  Voss told Eston that routine physical activity was paramount to improve her chronic pain condition.  Voss again told Eston to follow through in applying for discounted memberships or scholarships at the YMCA or Kroc Center to secure use of one of the pools.  Voss recommended that Eston not sit for

more than 90 minutes without stretching, toning, and walking during daytime hours.  R. 736.

On January 15, 2016, Eston saw Dr. Sharp for right shoulder pain. On examination, Eston had reduced range of motion in the right shoulder and positive Hawkins, Neer, and Empty Can tests.  R. 820.  X-rays showed increased mild arthritic changes.  R. 760.

On January 19, 2016, Eston saw Jeanette Edwards, QMHP, for a mental health assessment. R. 599-600.  Eston's husband accompanied her for this assessment.  Her husband was a cancer survivor and was physically and emotionally dependent on Eston.  They had six adult children.  At least 3 adult children and their significant others lived with Eston and her husband.  Eston said she watched six or more grandchildren at one time, with at least five under the age of 3.  Eston said she last worked at Walmart as a supervisor.  She said that she was fired for selling an item that was marked too low.  R. 599.

On January 29, 2016, 2016, Eston saw Dr. John Bejoy, M.D., for an outpatient psychiatric evaluation.  R. 790-92, 800-02.  Eston reported that she took care of many of her 12 grandchildren.  She said she also took care of her husband who was a cancer survivor.  Eston reported that she had a prescription for an antidepressant medication Effexor, but sometimes

she did not take the medication because she was busy.  Eston reported that she had smoked marijuana regularly since she was 12 years old.  Eston said she got a GED.  The mental status examination showed that Eston's mood was euthymic and her affect was congruent to her mood.  She denied any suicidal or homicidal ideations.  She had no psychosis.  Her judgment and insight were fair to good.  Dr. Bejoy assessed adjustment disorder with mixed depression and anxiety, and cannabis dependence.  Dr. Bejoy prescribed medication.  R. 791, 801.

On February 8, 2016, Eston saw nurse practitioner Voss.  Eston could not quantify her improvement since she started seeing Voss for pain management.  Eston said she did not follow through with the physical therapy because she was too busy.  Eston also said she was not routinely performing at cardiovascular level activity because she was too busy.  Eston said that her husband was in a wheelchair awaiting surgery.  She said two of her adult daughters planned to move back into their home.  If so, 11 people would be living in their home.  Eston said that her sleep was significantly improved.  R. 738.

On examination, Voss observed that Eston could sit through the office visit without needing to stand or reposition herself.  R. 738. The office visit lasted an hour.  R. 739.  Eston continued to walk upright without

leaning forward or rounding her shoulders. Eston had strong strength bilaterally and mildly deconditioned musculature in her arms and legs. Eston's abdominal core remained somewhat deconditioned. Voss told Eston that she needed to continue regular cardiovascular level activity to see improvement or to maintain the improvement she had already attained. Voss noted that Eston was not performing the recommended water exercises because she was too busy. Voss told Eston "that any further misses will result in her discharging herself from the program." R. 738-39.

On February 16, 2016, a physical therapist sent a letter to nurse practitioner Voss. The letter stated that Eston attended an initial evaluation for physical therapy on November 16, 2015. Eston told the therapist that she wanted to wait to attend additional physical therapy sessions until her insurance would authorize payment. On January 4, 2016, the therapist received authorization. The therapist attempted to contact Eston to schedule additional physical therapy sessions but Eston would not return the therapist's telephone calls. The therapist told Voss that she discharged Eston from further treatment because she did not return calls. R. 848.

On February 17, 2016, Transitions of Western Illinois completed a mental health assessment of Eston. R. 584-96. The assessment form stated that the assessment was initiated on December 3, 2015, but the

mental health professionals signed the form on February 17, 2016.  Eston listed her hobbies as growing flowers, gardening, and making jewelry.  R. 586.

On February 19, 2016, Eston had an MRI of her right shoulder.  The MRI showed full-thickness tearing of the supraspinatus and infraspinatus tendons.  R. 763.  Advance Practice Nurse Haubrich administered steroid injections into Eston's right shoulder.  R. 764.

On March 3, 2016, Eston had an MRI of her cervical spine.  The MRI showed old mild compression deformities at C4, C5 and C6; and mild subluxation at multiple levels.  R. 770.

On March 22, 2016, Dr. Tamara Pylawka, M.D., performed rotator cuff repair and subacromial decompression surgery on Eston's right shoulder.  R. 741-45.  Dr. Pylawka noted that she wanted Eston to keep the right arm in the sling provided after the surgery.  R. 744.

From March 29, 2016 to April 21, 2016, Eston saw mental health counselors at Transitions of Western Illinois.  During these sessions, Eston reported that several of her children and grandchildren lived with her and her husband.  She reported that she watched the grandchildren.  R. 608-13.

On April 26, 2016, Eston began physical therapy after her rotator cuff repair surgery.  R. 676-717.  Eston arrived at the session with her right arm in the sling, but without the abductor pillow provided to her.  Eston told the physical therapist that she was not following restrictions given to her after the rotator cuff surgery.  Eston stated that she hated the sling and did not use the abductor pillow.  R. 677.

On April 28, 2016, Eston saw nurse practitioner Voss for pain management consultation.  Eston cancelled the March 14, 2016 visit.  Eston then delayed her visit due to her shoulder surgery.  Eston reported at this visit that she experienced "some to a lot of improvement of her chronic pain" since her initial visit with Voss.  The shoulder surgery decreased Eston's level of physical activity.  Eston said her pain ranged from 4/10 to 10/10.  Her pain was 6/10 at the office visit.  Eston said she walked 10-15 minutes on her treadmill two to three times a week for the last seven to 10 days.  On examination, Eston sat through the entire office visit without needing to stand or reposition herself.  R. 746.  The appointment took 45 to 60 minutes.  R. 748.  Eston walked upright without leaning or using a wide-based stance.  Her musculature in her arms and legs was mildly deconditioned.  Her strength was strong and equal bilaterally, but she had her arm in a sling due to the shoulder surgery.  Her abdominal core was

somewhat deconditioned.  Voss asked Eston to determine when she could be more active.  Voss "strongly admonished" Eston to engage in a walking regimen on 10-15 minutes on her treadmill twice a day.  R. 746-47.

On May 4, 2016, Eston had a physical therapy session for her right shoulder.  Eston said that her pain was worse.  She rated her pain at 8/10.  She also reported marked weakness, loss of motion, and stiffness.  She also reported that she folded laundry that morning.  The physical therapist reminded Eston of the importance of wearing her sling.  Eston tolerated the treatment with moderate complaints of pain and difficulty.  R. 685-86.

On May 26, 2016, Eston had a physical therapy session.  Eston again rated her pain at 8/10, with marked weakness, loss of motion, and stiffness.  Eston reported that she was a little sore and tried to do some light yard work.  R. 702.  Eston tolerated the session with minimal complaints of pain and difficulty.  R. 703.

On the same day, May 26, 2016, Eston saw nurse practitioner Voss for pain management consultation.  R. 749-51.  Eston said her pain was 30% improved.  She said she was walking on the treadmill twice a day at home.  She said that her pain ranged from a 3/10 to 10/10.  R. 749.  On examination, Eston repositioned herself several times during the session.  Eston's gait was essentially normal.  Eston engaged in mild posturing while

going from sitting to standing.  Eston's musculature was mildly deconditioned.  Her strength was strong bilaterally.  Voss told Eston that she should be performing water exercises two to four times a week in addition to walking on the treadmill.  Eston again had not followed through with applying at the YMCA or the Kroc Center to get a scholarship or other reduced cost membership to use the pool at either facility.  R. 749-50.

On June 9, 2016, Eston had a physical therapy session for her shoulder.  Eston rated her worst pain at 8/10.  Eston reported a marked degree of weakness and stiffness in her shoulder.  Eston said that her right shoulder was very sore.  She said she fell on her shoulder again the prior week.  R. 708.  Eston completed the physical therapy session with moderate complaints of pain and difficulty.  R. 709.

On June 14, 2016, Eston had a physical therapy session for her shoulder.  Eston rated her worst pain at 8/10.  Eston reported a marked degree of weakness and stiffness in her shoulder.  Eston stated that she was very sore after she set up the pool for her grandchildren.  R. 710.  Eston tolerated the physical therapy session with mild complaints of pain and difficulty.  R. 711.

On August 4, 2016, Eston had her final appointment with nurse practitioner Voss for pain management consultation.  R. 752-54.  Voss

stated that Eston rescheduled her appointment with Voss several times since the last appointment on May 26, 2015. Eston reported a 10 to 30% improvement in her sleep, a 60% improvement in her daily activity level, and a 30-45% improvement in her chronic pain level since she first saw Voss on November 12, 2015. Voss stated, "Throughout the time the patient has been seen in the Pain Service she has been plagued with financial difficulties, family stress and difficulties at home, with multiple grown children living with her and her husband, for which she categorizes as a very chaotic home life and for which she provides the majority of the daycare for multiple grandchildren." Eston was taking hydrocodone, Effexor, Baclofen, and Gabapentin for pain. R. 752. On examination, Eston sat for the entire office visit without needing to stand or reposition herself. Eston's gait was steady without use of assistive devices. She could walk around the room easily. Eston engaged in mild posturing going from sitting to standing. Her musculature was mildly deconditioned. Her strength was equal bilaterally. Voss reviewed the importance of routine cardiovascular activity. Voss praised Eston for walking on the treadmill. She encouraged Eston to try again to get a scholarship for membership at the YMCA or Kroc Center to use the pool for exercises. Voss stated, "It was again reiterated clearly with patient that the amount of improvement in her cardiovascular

level activity directly relates to the amount of improvement she will have in her chronic pain condition in the long run." R. 753. Voss concluded her note on the visit:

> At this time, it appears that we have met maximum benefit from our perspective with patient's moderate participation in the chronic pain program, although 30% overall Improvement in her chronic pain condition is considered good in the chronic pain world. We will return her care to her primary care provider, Dr. Sharp, with the understanding that we would be happy to see her in the future If she is willing to be more participatory in improving her overall chronic pain condition in the future.

R. 753.

On August 10, 2016, Eston was discharged from physical therapy after rotator cuff surgery because of poor attendance compliance. R. 717.

On August 17, 2016, Eston saw psychiatrist Dr. Bejoy for medication management. Dr. Bejoy noted that Eston was taking care of her husband who had health issues. Dr. Bejoy noted that Voss dropped Eston as a patient. R. 787. Dr. Bejoy's mental status examination was normal. Dr. Bejoy noted that Eston's attitude toward treatment was fair and her compliance was fair. He found that her psychiatric condition was stable. R. 788.

On February 15, 2017, Eston saw Dr. Bejoy for medication management. R. 845-46. Eston reported that she was erratic with her treatment regimen. She said that she was not taking her Effexor. She did

not like it and wanted to try something else.  R. 845.  Dr. Bejoy's mental

status examination was normal.  Dr. Bejoy assessed Eston's attitude to

treatment was fair and her compliance with treatment as erratic.  Dr. Bejoy

changed Eston's medication.  R. 846.

<u>THE EVIDENTIARY HEARING</u>

On March 15, 2017, the Administrative Law Judge (ALJ) conducted

an evidentiary hearing in this case.  R.36-82.  Eston appeared in person

with her attorney.  Vocational expert Barbara Myers appeared by

telephone.  R. 38, 40.[2]

Eston testified first.  Eston said she was born on May 21, 1963.  She

completed high school but secured her GED before her class graduated.

Eston was married and lived with her husband in a house.  She had five

adult children.  R. 43, 47.

Eston said that she used to work in the jewelry department  and the

cash office at a Walmart store.  R. 43.

Eston based her disability claims on her physical limitations.  R. 44.

Eston testified that she had undergone three back surgeries.  She fell at

home in October of 2010 and hurt her back.  R. 43.  She had surgery on

---

[2] Vocational expert Myers' named is spelled "Meyers" in the hearing transcript.  Her named is spelled "Myers" on her resume.  R. 285.

November 4, 2010 and two more in 2016.  She said that in 2016, she had rods and screws put into her back.  The rods went vertically from her bra-line down to her hips.  She had two steroid injections.  Each injection relieved her pain for about four days.  Her back pain worsened after each surgery.   R. 49-50.

Eston described her back pain.  The pain started at the top of the rods and went down to her buttocks.  The pain felt "like fire" when she went upstairs.  Her pain felt like a "hot burn" and was constant.  She could tolerate the pain lying down.  Getting out of bed was painful.  R. 51.

Eston said she had numbness in her left leg from the knee down and including her foot.  The leg felt swollen even though it was not.  She said she had this feeling since her first fall in 2010.  The surgery made the pain worse.  R. 53.  She said that socks and shoes caused pain by rubbing her foot.  She could not cut her toenails and she had a special, extra soft blanket to put over her feet at night.  Eston had no problems with her right foot.  R. 53-54.  She had problems walking because of her problems with her left foot.  Her knee was numb and stayed numb.  She said that her left foot catches on things while she walks.  She indicated that she did not pick up her left foot when she walked.  R. 55-56.

Eston said she had steroid injections in her left knee after she tore a meniscus.  She said that she had difficulties bending her left knee and going up stairs with her left knee due to stiffness. She often fell going up steps.  R. 58-59.

Eston testified that the upper part of her neck got "really painful."  She said her neck hurt all day.  R. 54.

Eston said she had pain in her right shoulder.  She said her right shoulder was not as strong as it used to be and the shoulder ached.  She testified she cannot lift even a gallon of milk with her right arm.  Eston indicated that she had pain extending her arm forward or lifting the arm overhead.  She had no problems with the use of her right hand.  R. 56-57.

Eston testified she had problems sleeping at night.  She went to bed about 10:30 p.m. and got up around 7:00 a.m.  R. 69.  Her back pain woke her up at least twice each night.  She also put a pillow between her knees and behind her back when she slept.  R. 68-69.  She took naps two to three times a day. Each nap lasted an hour or two.  R. 63.

Eston said she used heat and ice on her back daily.  R. 66.  Four to five times a day she used a heating pad while lying in bed.  Each time, she used the heating pad for 20 to 30 minutes.  R. 65.  She said that at least three times a day, she used ice packs while lying in bed.  Each time, she

used the ice packs 10 minutes.  R. 65.  Eston estimated that due to her

naps and her use of ice packs and heating pads, she spent six to eight

hours between 9:00 a.m. and 5:00 p.m. lying down on her bed.  She said

lying down was the most comfortable position for her.  R. 69.

Eston testified that she used prescription lidocaine ointment and

Vick's on her back, shoulder, and knee.  She also used a lidocaine patch

on her back.  R. 66-67.  She tried a TENS unit on her back but

discontinued it because the unit caused pain.  She said the unit "sent

electric sparks all through my back." R. 67.

Eston opined that she could sit for 20 to 30 minutes.  After that time,

she began experiencing pain.  She said that she could stand for 10 to 15

minutes.  After that time, her leg would start to hurt and cramp.  She said

the heaviest object she could lift was "not five pounds."  R. 70.

Vocational expert Myers then testified.  The ALJ asked Myers the

following hypothetical question:

> [A]ssume a hypothetical individual of the claimant's age,
> education, and work history, with a residual functioning capacity
> that would allow the individual to work at a light exertional level,
> with certain limitations: would never climb ladders, ropes, or
> scaffolds, or be exposed to unprotected heights or hazardous
> work environments; would not operate a  motor vehicle in the
> workplace; would occasionally climb stairs or ramps; frequently
> balance -- . . . .  [f]requently.  Would occasionally stoop, kneel,
> crouch, or crawl; . . . .  So, let's start with that information on the

> first hypothetical, and ask whether the hypothetical individual
> can perform any of the past work of the claimant.

R. 72.  Light work generally means lifting 20 pounds occasionally and 10

pounds frequently and standing or walking for six hours in and eight-hour

workday.  Light work may involve sitting most of the time if the person must

push and pull arm-hand or leg-foot controls.  SSR 83-10, 1983 WL 31251,

at *5 (January 1, 1983).  Myers opined that such a person could perform

Eston's past work in the cash office and in the jewelry department at

Walmart, either as Eston performed those jobs or as those jobs are

performed in the national economy.  R. 72-73.

The ALJ asked Myers to consider a modification to the prior

hypothetical question to assume the person could only balance

occasionally, could do no overhead lifting with the right dominant arm,

could not engage in tasks that required fingering and handling.  Myers

opined that could preclude the person from performing Eston's prior

relevant work.  R. 73.  Myers opined that such a person could perform

other jobs that existed in the national economy.  Myers opined that such a

person could perform the light exertional jobs of collator operator, with

28,000 such jobs in the national economy; and marker, with 330 such jobs

in the national economy.  Myers opined that such a person could perform

the sedentary exertional level jobs of addressing clerk with 21,500 such

jobs in the national economy; and document preparer, with 16,500 such jobs in the national economy.  R. 73-74.  Sedentary work generally involves lifting no more than 10 pounds and performing the job primarily while sitting, although a job may still be sedentary if the person occasionally walks or stands to perform the job.  SSR 83-10, 1983 WL 31251, at *5.

Myers opined that a person could not work if she had to miss work two or more days a month.  R. 74.  Myers testified that the person described in the ALJ's second hypothetical question would be precluded from working if she also could not work with her arms extended in front of her.  Myers indicated that if the person needed to lie down during the day other than at scheduled lunch and break times, the person would be precluded from working.  Myers opined that the person could not work if she was off-task more than 20 percent of the workday.  R. 75-76.  The ALJ ended the hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued her decision on October 16, 2017.  R. 13-25.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920. Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that she is disabled

regardless of her age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet or be equal to the criteria of one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so

severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work

considering her age, education, work experience, and Residual Functional

Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If

the claimant cannot return to her prior work, then Step 5 requires a

determination of whether the claimant is disabled considering her RFC,

age, education, and past work experience.  20 C.F.R. §§ 404.1520(g),

404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  20 C.F.R.

§§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ determined that Eston met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity from her Onset Date of March 31, 2011 through her Last Date Insured of December 31, 2016. The ALJ further found that Eston suffered from the severe impairments of degenerative disc disease; spondylolisthesis; lumbago; status post multiple back surgeries, including lumbar fusion and cage insertion; radiculopathy, osteoarthritis of the left foot; osteoarthritis of the right shoulder, status post right rotator cuff repair; mild degenerative joint changes in the AC joint; obesity; and cannabis dependence. R. 16-18. At Step 3, the ALJ determined that Eston's impairments or combination of impairments from her Onset Date through her Last Date Insured did not meet or equal a Listing. R. 18.

At Step 4, the ALJ found that Eston had the following RFC:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can never climb ladders, ropes, or scaffolds. The claimant can never be exposed to unprotected heights or hazardous work environments. The claimant can never operate a motor vehicle in the work place. The claimant can occasionally climb stairs or ramps, balance,

stoop, kneel, crouch, or crawl. The claimant can never lift
overhead with the dominant right arm. The claimant can
frequently engage in tasks that require handling and fingering.
The claimant is limited to remembering and carrying out simple,
routine tasks and making simple work-related decisions. The
claimant cannot perform production pace tasks that have strict
end-of-day production goals.

R. 19.  The ALJ found that the 2010 surgery largely relieved Eston's back

pain until November 2014 because she had little treatment in 2011, no

treatment in 2012, and she had no treatment from an emergency room visit

in September 2013 until November 2014.  R. 21.

The ALJ found that after the January 2015 surgery, Eston was non-

compliant with her prescribed treatment.  Dr. Kukkar instructed her to wear

a back brace, but she refused.  He recommended aquatic therapy, but she

did not comply.  The ALJ noted that Eston said that she was too busy to

participate in physical therapy.  Pain management nurse practitioner Voss

repeatedly instructed Eston to apply for a scholarship or reduced cost

program to join the YMCA or Kroc Center so she would have access to a

pool to perform her aquatic therapy exercises, but she never attempted to

apply.  Dr. Pylawka instructed Eston to keep her arm in a sling and to use

an abductor pillow after her shoulder surgery, but she hated the sling and

did not use the abductor pillow.  The ALJ found that the evidence of non-

compliance indicated that her pain was not as severe as she claimed, otherwise she would have complied with the treatment plan.  R. 22-24.

The ALJ relied on the evidence that showed that Eston's condition improved even though she did not comply with her prescribed treatment. The ALJ noted that Eston's condition improved during her sessions with Voss from November 2015 to August 2016.  R. 22.  The ALJ noted that Eston rescheduled appointments several times in 2016, "suggesting that her pain symptoms were not especially bothersome."  R. 22.

The ALJ also relied on Eston's activity level in assessing her RFC. The ALJ noted that she took care of her husband and grandchildren.  The ALJ also noted that Eston reported regular walking for exercise.  The ALJ noted that Eston reported engaging in activities such as "spring cleaning," raking the yard, folding laundry, gardening, making jewelry, yard work, cut the grass, and set up a pool for her grandchildren.  R. 24-25.  The ALJ found that level of activity was consistent with the RFC finding.  R. 25.

The ALJ found that lifting restrictions by Dr. Tayag in 2010 and Kukkar in 2015 were temporary post-operative restrictions not indicative of her long-term lifting capabilities.  The ALJ gave some consideration to Dr. Mitra's opinion that limited Eston to a limited range of sedentary work.  The ALJ gave weight to the postural limitations and limitations on climbing but

did not give weight to the limitation to sedentary work rather than light work that the ALJ found in the RFC.  The ALJ explained, "[T]he restriction to sedentary work is not consistent with the medical evidence that shows gaps in treatment, non-compliance with prescribed treatment modalities, and a high level of activities of daily living."  R. 26.  The ALJ concluded the RFC analysis as follows:

> In sum, the above residual functional capacity assessment is supported by the objective radiographs and imaging studies, her course of treatment, and her medications.  However, a more restrictive residual functional capacity is not supported by the gaps in treatment, her non-compliance with prescribed treatment modalities, and her high level of activities of daily living.

R. 27.

The ALJ found at Step 4 that Eston was unable to perform her prior work.  R. 27.  The ALJ found at Step 5 that Eston could perform a significant number of jobs in the national economy.  The ALJ then asked Myers to modify the RFC as stated above with the assumption stated above on page 34.  R. 73-74.  The ALJ relied on the RFC finding; the Medical Vocational Guidelines, 20 C.F.R. Part 404 Subpart P, Appendix 2; and the opinions of vocational expert Myers based upon the modified RFC that a person with Eston's age, education, work experience, and RFC could

perform the representative jobs of collator operator and marker.  R. 28.

The ALJ concluded that Eston was not disabled.  R. 29.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine

whether it is supported by substantial evidence.  Substantial evidence is

"such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's findings are supported by substantial evidence. The evidence supported the conclusion that Eston did not suffer from significant back pain from at least 2011 to November 2014. The record contains little evidence of treatment for Eston's back during this period. Eston raised the back pain issue in November 2014 to advanced practice nurse Haubrich as a new problem. In December 2014, Eston told Dr. Kukkar that her back pain had come back. This evidence supports the ALJ's conclusion that Eston's 2010 surgery was largely successful in relieving her back pain prior to November 2014.

Eston's testimony regarding the functionally limiting effects of her pain after November 2014 is not consistent with her medical records, including her self-reported activity level in those records. Eston testified at the hearing that she spent six to eight hours a day from 9:00 a.m. to 5:00 p.m., lying down on her bed, often on either a heating pad or an ice pack. However, Eston reported in her medical records that she took care of an ill husband who was in a wheelchair, regularly watched six or more grandchildren, went on regular walks, and engaged in several types of

household tasks.  The evidence supports the ALJ's conclusion that Eston's pain was not as debilitating as Eston claimed in her testimony.

The evidence further shows that Eston's condition improved even though Eston did not comply with prescribed treatment.  Eston did not comply with several aspects of her prescribed treatment.  She did not wear the prescribed back brace.  After her shoulder surgery, she did not use the prescribed abductor pillow and hated the prescribed sling.  In January 2016, Eston never returned her physical therapist's call to schedule aquatic therapy.  In August 2016, she was discharged from physical therapy for poor attendance.  Eston also was not compliant with nurse practitioner Voss' instructions, and Voss finally terminated care.  Voss offered to take Eston back on as a patient "If she is willing to be more participatory in improving her overall chronic pain condition in the future."  R. 753.   Still, Voss found that Eston's condition improved from her sessions.  Eston's gait and posture improved, her sleep hygiene improved, her pain level improved, and her cardiovascular activity level increased.  All this evidence supported the ALJ's conclusion that Eston's RFC was greater than that described by Eston's testimony and other statements.

The ALJ's decision to find that Eston had the RFC to engage in a limited range of light work was supported in part by Dr. Mitra's opinion that

Eston could stand and/or walk for six hours in an eight-hour workday.  Light work involves sitting or standing for six hours a day.  SSR 83-10, 1983 WL 31251, at *5.  Dr. Mitra, however, also opined that Eston could only lift 10 pounds, which is consistent with sedentary work rather than light work.  Id. The ALJ did not give weight to this aspect of Dr. Mita's opinion because of the gaps in Eston's care, the other medical evidence, her non-compliance with prescribed treatment, and her level of activity.  The treatment records after Dr. Mitra's opinion provide support for this finding.  Eston's decision to forgo physical therapy, particularly the aquatic therapy approved by Medicaid in 2016, provides substantial evidence on which the ALJ could conclude that Eston's limitations had improved.  Eston also missed several appointments with Voss and did not comply with Voss' instruction to apply for a reduced cost membership at the YMCA or Kroc Center to get access to a swimming pool for aquatic exercises.  Even so, Eston's gait improved, her posture improved, her sleep hygiene improved, her pain was reduced, and her cardiovascular activity increased.  This evidence provides substantial evidence to support the ALJ's assessment of Dr. Mitra's opinion in formulating the RFC finding.[3]

---

[3] The ALJ did not mention Dr. Kim's May 30, 2014 opinions so the Court does not consider them in this analysis.  Eston does not raise this omission as an error and so forfeits the matter.  See e.g., Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000).  In addition, any error in failing to mention Dr. Kim's opinions

The RFC finding, combined with the Medical-Vocational Guidelines and the opinions of vocational expert Myers provided substantial evidence to support the conclusion at Step 5 that Eston could perform a significant number of jobs in the national economy.

Eston argues that the ALJ's RFC determination was not supported by the evidence.  Eston essentially asks the Court to reweigh the evidence. The Court will not do this.  Jens, 347 F.3d at 212; Delgado, 782 F.2d at 82. For the reasons stated above, the RFC was supported by substantial evidence.

Eston argues that the ALJ should have given weight to the consultative examinations of Drs. Leung and Kozma.  The ALJ considered these examinations in her decision.  R. 21, 23.  The ALJ did not need to weigh these doctors' opinions because they offered no opinions on Eston's functional limitations, such as how long she could sit or stand, or how much she could carry or lift.  See Mathews v. Colvin, 2015 WL 1278991, at *5 (C.D. Ill. March 18, 2015).  There was no error in the ALJ's analysis of these consultative examinations.

---

would be harmless because Dr. Kim opined that Eston's RFC at least equaled or exceeded the ALJ's ultimate RFC finding.  See McKinzey v. Astrue, 641 F.3d 884, 891-92 (7th Cir. 2011).

Eston argues that the ALJ did not consider Eston's testimony that she spent much of her days on either a heating pad or an ice pack. The ALJ considered this testimony. R. 20. The ALJ found the testimony to be inconsistent with Eston's reports in the medical records that she cared for her ill husband, regularly watched 5 or more grandchildren, walked regularly for exercise, and engaged in other activities. There was no error.

Eston argues that the ALJ erroneously equated activities of daily living with the activities of a full-time job. The Court disagrees. The ALJ specifically stated that she was not equating activities of daily living with work activities. R. 25. Rather, the ALJ considered Eston's activities of daily living along with the other evidence in the record. ALJs are required to consider daily activities along with other evidence in the record in determining the limiting effect of a claimant's symptoms, including her pain. SSR 16-3p, 2017 WL 5180304, at *7 (October 25, 2017). The Court sees no error.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 12) should be ALLOWED; Plaintiff Lauren A. Eston's Brief in Support of Motion for Summary Judgment (d/e 10) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   January 3, 2020

_____s/ *Tom Schanzle-Haskins*_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE